Richard P. Makoff and Colleen M. Makoff, Et Al. [1] v. Commissioner. Makoff v. Commissioner
Docket Nos. 1228-64, 1229-64, 1248-64, 1271-64, 1281-64, 3204-64 - 3206-64, 3208-64 - 3212-64, 3217-64, 110-65, 111-65, 1731-65.
United States Tax Court
T.C. Memo 1967-13; 1967 Tax Ct. Memo LEXIS 245; 26 T.C.M. (CCH) 83; T.C.M. (RIA) 67013; January 30, 1967
Daniel L. Berman, for the petitioners. David R. Brennan and Roger A. Pott, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined a deficiency in estate tax of petitioner in Docket No. 1731-65 in the amount of $107,964.41 and deficiencies in income taxes of petitioners in the years and amounts as follows: Docket
No.
Year
Deficiency
1228-64
1959
$ 14,735.08
1229-64
1959
14,567.87
1248-64
1959
7,647.92
1271-64
1959
7,647.92
1281-64
1959
7,647.92
3204-64
1959
7,647.92
1960
2,208.65
3205-64
1959
7,647.92
1960
2,208.65
3206-64
1959
7,647.92
1960
2,208.65
3208-64
1960
2,208.65
3209-64
1959
7,647.92
1960
2,208.65
3210-64
1960
$ 2,208.65
3211-64
1960
9,923.21
3212-64
1960
2,208.65
3217-64
1960
10,437.60
110-65
1961
105,482.27
111-65
1961
106,248.29
*246 In his amended answer respondent redetermined the alleged deficiency in estate tax in Docket No. 1731-65 in the amount of $107,964.41, plus an increased deficiency in estate tax in the amount which would result by increasing the fair market value of the Makoff, Inc., and Makoff Realty Company nonvoting stock over that determined by respondent, claim for which is made pursuant to the provisions of section 6214(a) of the 1954 Internal Revenue Code. A number of issues raised in the pleadings have been settled prior to the filing of briefs herein. [2] The questions presented for decision are as follows: (1) Is the value of nonvoting stock transferred to the Samuel Makoff Foundation, Inc., unascertainable so that the charitable deduction therefor is not allowable; (2) alternatively, have petitioners proven the fair market value of the shares of nonvoting stock contributed to the aforesaid Foundation; and (3) what is the fair market value of the voting and nonvoting stock of Makoff, Inc., and Makoff Realty Company for purposes of determining the gross estate of Samuel Makoff, dececeased. *247 Findings of Fact Some of the facts have been stipulated, and the stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Richard P. Makoff (hereinafter referred to as Richard) and Colleen M. Makoff filed Federal joint income tax returns for the taxable years 1959, 1960, and 1961 with the district director of internal revenue for the district of Utah. Petitioners Samuel E. Makoff, Jr. (hereinafter referred to as Samuel, Jr.), and Verna A. Makoff filed Federal joint income tax returns for the taxable years 1959, 1960, and 1961 with the district director of internal revenue for the district of Utah. Samuel Makoff and Syril Makoff filed a Federal joint income tax return for the taxable year 1959 with the district director of internal revenue for the district of Utah. Samuel Makoff, deceased, Richard P. Makoff, Special Administrator, and Syril Makoff filed a federal joint income tax return for the year 1960 with the district director of internal revenue for the district of Utah. An estate tax return for Samuel Makoff, deceased, was filed with the district director of internal revenue for the district of Utah. Makoff Realty Company *248 (hereinafter referred to as Realty) was incorporated on April 22, 1953, under the laws of the State of Utah. Up to and including April 30, 1961, Realty was primarily engaged in the business of holding real estate for investment. The outstanding capital stock of Realty, both voting and nonvoting, had a fair market value of $175,037.50 at all times relevant hereto. In the fiscal year 1961 Realty had total income of $84,287.07 and taxable income of $12,983.40. Prior to Samuel Makoff's death, Samuel Makoff, Richard, and Samuel, Jr., served as directors of Realty. After Samuel Makoff's death, Edward Spitzer (hereinafter referred to as Spitzer) became a director of Realty. During its taxable year ended April 30, 1961, Samuel, Jr., and Richard each received $1, 000 in salary from Realty. Prior to Samuel Makoff's death, neither Samuel Makoff, Richard, nor Samuel, Jr., received any salary from Realty. The Samuel Makoff Foundation, Inc. (hereinafter referred to as the Foundation), is a nonprofit corporation which was incorporated on October 29, 1951, under the laws of the State of Utah. The Foundation is a private, charitable foundation organized solely for charitable, religious, scientific, *249 literary, and educational purposes. On June 13, 1953, the Foundation was granted an exemption letter by respondent which has never been revoked. Samuel Makoff, Richard, and Samuel, Jr., were the trustees of the Foundation from the date of its incorporation to the date of Samuel Makoff's death, and, thereafter, Richard and Samuel, Jr., were the trustees. None of the trustees of the Foundation ever received any salary, loan, or other financial benefit from the Foundation. The Foundation throughout its existence, including the period involved herein, engaged in extensive charitable activities. During the five-year period January 1, 1958, to December 31, 1962, the Foundation received $23,885.51 in cash contributions. During the period January 1, 1957, through December 31, 1962, the Foundation made charitable contributions in the total amount of $45,835.05. All the donees were either charitable, religious, or educational organizations. Makoff, Inc., operates one of the out-standing, high-quality women's specialty stores in the Intermountain area. It and its noncorporate predecessors, under the direction of Samuel Makoff, have operated a ladies apparel and specialty store in Salt Lake *250 City since 1918. At all times relevant hereto, Makoff, Inc., occupied a modern building, well suited to its business needs, located at a prime location in Salt Lake City. It had excellent merchandising, utilized sound promotion techniques, and exhibited a knowledge of fashion essential to its successful operation. It also possessed an excellent credit rating. From 1950 through 1961 no limitations were placed on Makoff, Inc.'s credit. Moreover, it was always able to take advantage of cash discounts offered by manufacturers on purchases of merchandise for early payment, which is essential to the financial success of such a business. Makoff, Inc.'s bad debt ratio during the years 1959, 1960, and 1961 was one-half of one percent of charge account sales. Its customer relations were of the highest order. The principal assets of the business consisted of cash, inventory, and accounts receivable. Its inventory has consistently been sold in the due course of business. It maintained a ratio of current assets to current liabilities during the years 1955 through 1961 as follows: Year
Assets
Liabilities
Ratio
1/1/55 to 1/31/55
$543,703.00
$145,466.57
3.74 to 1
2/1/55 to 1/31/56
598,098.86
173,859.91
3.44 to 1
1/31/57
544,018.00
128,485.90
4.23 to 1
1/31/58
580,326.84
166,495.59
3.49 to 1
1/31/59
638,088.25
224,056.15
2.85 to 1
1/31/60
639,638.88
235,619.38
2.71 to 1
1/31/61
705,675.92
220,689.53
3.20 to 1
*251 The net worth was highly liquid. The following is a schedule reflecting the gross sales, after returns and allowances; net income; dividends paid; and earned surplus of Makoff, Inc., for the years 1946 through 1962 as shown on its books and tax returns: Earnings &
Year
Gross Sales
Net Income
Dividends
Profits
1946
$ 353,360.48
$ 6,202.33 $0
$ 4,777.78
1947
1,188,356.81
98,152.97
0
65,632.62
1948
1,165,818.95
92,170.17
0
122,973.13
1949
1,063,402.91
57,901.25
[1] 100,000.00
58,986.26
1950
1,080,816.94
86,439.28
0
112,887.11
1951
1,132,047.79
93,926.87
0
161,036.25
1952
1,188,077.05
75,461.56
[1] 110,000.00
94,036.43
1953
1,226,964.23
36,770.81
146,800.00
25,175.42
1954
1,150,183.52
45,932.47
0
50,885.03
1/1/55 to 1/31/55
88,095.73
940.93
0
51,236.43
2/1/55 to 1/31/56
1,201,982.85
43,763.97
0
77,238.95
1/31/57
1,223,286.19
14,487.25
0
83,588.10
1/31/58
1,397,930.78
708.94
0
83,087.25
1/31/59
1,440,528.66
0
0
83,288.10
1/31/60
1,583,083.51
0
0
73,275.42
1/31/61
1,552,648.56
0
13,033.03
59,160.39
1/31/62
1,535,251.78
10,000.00
12,901.92
52,536.47
*252 In 1959, 1960, and 1961 the retail business in downtown Salt Lake City exhibited excellent growth potential, and Makoff, Inc., was expected to benefit and participate in said growth. In all, Makoff, Inc., was a very successful business operation during the years involved herein. Prior to Samuel Makoff's death, he, Richard, and Samuel, Jr., were the directors of Makoff, Inc. Richard served as secretary-treasurer, and Samuel, Jr., was a vice-president in charge of merchandising. After Samuel Makoff's death, Richard became Makoff, Inc.'s chief executive officer, replacing Samuel Makoff, and Spitzer became a director. In 1954 Makoff, Inc., adopted a pension and profit-sharing plan (hereinafter referred to as the Plan) which was a retirement plan. [3] On December 20, 1957, the Plan was amended by a document styled "Amendment No. 1." Amendment No. 1 provided, inter alia, as follows: 6.2(a) The employer shall contribute to the trust for each taxable year of the employer commencing with the year ending January 31, 1958 and thereafter during the continuance of this plan, 100% of its annual net profits as herein defined; provided however, that the contribution of the Employer shall not *253 exceed fifteen per cent (15%) of the compensation otherwise paid for the year to its Members under this Plan, plus "carry over" contributions, if any. "Carry over contributions" shall mean the difference between the contributions actually paid pursuant to the foregoing profit-sharing formula and fifteen per cent (15%) of said compensation otherwise paid to Members in those years when the net profits of the Employer result in a contribution to the fund which is less than fifteen per cent (15%). In no event shall the total contributions paid in any one year exceed thirty per cent (30%) of the compensation paid during the year of contribution. * * *
13.1 In the event of severance of a member for reasons other than temporary or permanent disability or retirement, his termination benefits shall be the following percentage of his account (including the cash value of any insurance or annuity contract based upon his life) based upon the number of his years of membership in the plan: Years of Membership
Percentage
Less than 11 years
0%
11 years
5%
Years beyond 11
5% additional for each
membership year be-
yond 11 but not to
exceed a maximum of
100%
*254 At the time Amendment No. 1 was adopted the Makoffs were of the opinion that Makoff, Inc.'s executive personnel did not have sufficient amounts in their profit-sharing accounts to permit their retirement. [4] Amendment No. 1 was adopted for the purpose of benefiting Makoff, Inc.'s executive personnel, thereby insuring their continued employment with Makoff, Inc., during a transitional stage in its management. [5] The Makoffs believed that by increasing contributions to the Plan the new personnel would be more likely to remain with Makoff, Inc. While the contributions under Amendment No. 1 were more generous than under the original plan, employees had to remain longer with Makoff, Inc., in order that their interests in the Plan vest. The Makoffs did not intend that Amendment No. 1 would be a permanent arrangement. In 1961 the Plan was amended by Amendment No. 2. This amendment provided that 100 percent *255 of Makoff, Inc.'s net profits in excess of $10,000 would be contributed to the Plan. Amendment No. 2 was effective with respect to the taxable year beginning February 1, 1961. On December 30, 1965, the Plan was amended by Amendment No. 3. The effect of this amendment was to require a contribution to the Plan each year but only in such amount as Makoff, Inc.'s board of directors would determine on or before January 31 of the prior year. Makoff, Inc., was successful in retaining its key personnel during the period in which Samuel Makoff died and Richard and Samuel, Jr., took over the direction of the business. During the years ended January 31, 1958, through January 31, 1962, Samuel, Jr., and Richard each received the following salaries from Makoff, Inc.: 1/31/58
$23,781.22
1/31/59
27,679.83
1/31/60
27,706.73
1/31/61
23,599.55
1/31/62
29,106.61
The salaries paid to Samuel Makoff, Samuel, Jr., and Richard showed a declining percentage in relationship to Makoff, Inc.'s gross sales, going from 5.75 percent for the fiscal year ending January 31, 1959, to 3.79 percent for the fiscal year ending January 31, 1962. In 1952 Makoff, Inc., leased two unimproved *256 parcels of land from Zions Securities Corporation (hereinafter referred to as Securities Corporation). On one parcel (Lot 5) was to be erected a Makoff, Inc., store building; the other parcel (Lot 4) was to be used as a parking lot. Under the lease with respect to the parking lot, Makoff, Inc., agreed to pay a rental of $6,000 per year. Under the lease with respect to the building site parcel, Makoff, Inc., agreed (1) to erect a store building at a minimum cost of $300,000 [6] and (2) to pay a rental of $15,000 per year. Real estate taxes on both parcels were to be paid by Securities Corporation. Both leases ran for a 30-year period. Makoff, Inc., transferred the leases to Realty in return for stock in Realty on May 1, 1953, and on October 25, 1955. On September 1, 1955, Realty and Makoff, Inc., executed a lease covering both portions of the property covered by the transferred leases. The Realty-Makoff, Inc., lease provided that Makoff, Inc., would pay Realty as rental for the premises an annual sum equal to 5 percent of gross sales or a minimum of $90,000. Prior to January 1, 1957, Realty and R & S Company, a general *257 partnership in which Samuel, Jr., and Richard were the general partners, expended $629,484.14 in improving the store building on Lot 5 and $130,437.40 in building a garage on Lot 4. On May 1, 1956, Realty assigned to R & S Company their realty and leasehold interests in Lots 4 and 5. In return therefor R & S Company agreed to pay to Realty $498,264.02 in cash as follows: (1) $51,765.52 in 10 equal installments commencing May 1, 1957, with interest at 4 percent from May 1, 1956; and (2) $446,498.50 with interest at 4 percent at the following rate: $8,564 on or before July 5, 1956; $8,564 on or before August 1, 1956; and $8,564 on or before the first day of each quarter thereafter. In addition, R & S Company assumed all of the obligations that Realty had incurred in connection with the improvements, and Realty was released from its obligations thereunder. Such obligations were as follows: (1) $223,600 note payable to Walker Bank & Trust Company; (2) $10,628.77 to Seligman & Latz; (3) $21,424.28 to Dohrman Hotel Supply Co.; and (4) $120,000 due to Makoff, Inc., on a note dated May 1, 1956. Commencing in 1951 Makoff, Inc., acquired land and erected personal residences *258 for Richard and Samuel, Jr. The home erected for Richard (hereinafter referred to as the Kaywood home) had a cost basis to Makoff, Inc., of $33,000. The home erected for Samuel, Jr. (hereinafter referred to as the Maywood home) had a cost basis to Makoff, Inc., of $38,680.68. During 1952 Makoff, Inc., acquired furnishing for the Maywood home at a cost of $2,750. In 1953 both homes were transferred to Realty incident to its formation. In 1956 each home was further improved at an aggregate cost of $32,543.20. In 1959 the Kaywood home was further improved at a cost of $10,141.08. As of April 30, 1961, the Maywood home had a cost, exclusive of land, of $58,571.76, and the Kaywood home had a cost, exclusive of land, of $65,462.15. During Realty's next taxable year, the cost of the Maywood residence was increased by a further sum of $6,849.34, and the cost of the Kaywood home was increased by a further sum of $26,603.84. The following schedule shows the annual rental paid by Richard and Samuel, Jr., to Realty with respect to their personal residences during the years 1959 to 1961: Year
Richard
Samuel, Jr.
1959
$2,400.00
$2,000.04
1960
2,400.00
2,000.04
1961
2,604.00
2,184.00
*259 On March 20, 1961, R & S Company acquired at a cost of $247,500 Securities Corporation's reversionary interest in the Makoff Lots 4 and 5, subject to the outstanding leases. On the same day, Securities Corporation paid to Realty $197,500 for two pieces of property - the Whitehall Building and a parking lot. As far as Securities Corporation was concerned, the transaction was regarded as an exchange of the Whitehall Building, the parking lot and $50,000 in cash in return for the fee interest in Lots 4 and 5, subject to the outstanding leases. The Makoffs, however, were concerned as to the manner in which the transaction was to be effected since two entities were involved. In order to effect the transaction fairly, the Makoffs employed Werner Kiepe, an M.A.I. appraiser, who made an appraisal of the fair market value of the properties involved. Kiepe's appraisal was used as a basis for arranging the transaction. In 1959 Realty acquired a 1959 and 1960 Jaguar automobile at a cost of $5,143 and $4,098.92, respectively. Makoff, Inc., in turn, leased the cars from Realty at a cost of $100 a month. Richard and Samuel, Jr., each paid Makoff, Inc., $50 a month per car as rental for their *260 personal use of such cars. Both cars were used to some extent for business purposes. On November 30, 1956, Makoff, Inc.'s Articles of Incorporation were amended to provide for the recapitalization of its outstanding common stock into two classes of common stock, voting and nonvoting stock, at a ratio of 99 shares of nonvoting stock to 1 share of voting stock. The voting stock and nonvoting stock differed only as to voting rights. On November 30, 1956, Realty's Articles of Incorporation were amended to provide for the recapitalization of its outstanding common stock into two classes of common stock, voting stock and nonvoting stock, at a ratio of 99 shares of nonvoting stock to 1 share of voting stock. The voting and nonvoting stock differed only as to voting rights. On December 1, 1956, Richard and Samuel, Jr., each sold 848.40 shares of common voting stock in Makoff, Inc., to Samuel Makoff for the consideration of $1.22 per share, which amount represented the book value per share of Makoff, Inc.'s outstanding common stock. Also on December 1, 1956, Richard and Samuel, Jr., each sold 491.68 shares of common voting stock in Realty to Samuel Makoff for a consideration of $1.02 *261 per share, which amount represented the book value per share of Realty's outstanding common stock. On December 10, 1956, Samuel Makoff transferred 160,641.36 shares of nonvoting common stock of Makoff, Inc., and 74,679.66 shares of nonvoting common stock of Realty to the Samuel Makoff Trust #201, a revocable trust never revoked by Samuel Makoff during his lifetime. On December 12, 1956, Samuel Makoff transferred 3,319.44 shares of common voting stock of Makoff, Inc., and 1,737.70 shares of common voting stock of Realty to the Samuel Makoff Trust #101, which was a revocable trust never revoked by Samuel Makoff during his lifetime. On January 4, 1957, Spitzer and Warren Wood each sold (a) 75.28 shares of Makoff, Inc., common voting stock to Makoff, Inc., for a consideration of $1.22 per share, which was the book value per share of Makoff, Inc.'s outstanding common stock and (b) 7,452.72 shares of Makoff, Inc.'s common nonvoting stock to Makoff, Inc., for a consideration of $1.22 per share, which was the book value per share of Makoff, Inc.'s outstanding common stock. Such stock was then cancelled by Makoff, Inc. On January 4, 1957, Spitzer and Wood each sold (a) 23.65 shares *262 of Realty common voting stock to Realty for a consideration of $1.02 per share, which was the book value per share of Realty's outstanding common stock and (b) 2,341.35 shares of Realty common nonvoting stock to Realty for a consideration of $1.02 per share, which was the book value per share of Realty's outstanding common stock. Such stock was then cancelled by Realty. On January 15, 1958, the Foundation sold 1,200 shares of Makoff, Inc., common nonvoting stock to Makoff, Inc., for a consideration of $1.25 per share, which was the book value per share of Makoff, Inc.'s outstanding common stock. Such stock was then cancelled by Makoff, Inc. During 1959, 1960, and 1961, the following shares of common nonvoting stock of Makoff, Inc., were given to the Foundation: No. of
Certificate
Date
Donor
Shares
No.
12/28/59
Richard
7,705
26
12/28/59
Samuel, Jr.
7,348
28
12/28/59
Samuel Makoff
7,061
30
12/20/60
Richard
8,115
39
12/20/60
Samuel, Jr.
7,984
41
12/30/61
Richard
10,328
47
12/30/61
Samuel, Jr.
10,574
49 Each of the above transfers was recorded on the stock books of Makoff, Inc., when the stock certificate was issued. The foregoing *263 gifts were completed gifts for Federal gift tax purposes. The stock record of Makoff, Inc., reflects that common nonvoting stock of Makoff, Inc., was given to the Salt Lake Jewish Welfare Fund (hereinafter referred to as the Welfare Fund) on the dates and in the amounts as follows: No. of
Donor
Date
Shares
Samuel Makoff
April 27, 1960
1,640
Richard
April 27, 1960
1,639
Samuel, Jr.
April 27, 1960
1,639
Richard
April 19, 1961
1,639
Samuel, Jr.
April 19, 1961
1,639 Certificates representing the above-said shares of stock were delivered on both dates by Richard to Richard McGillis, the solicitor for the Welfare Fund who received said certificates on behalf of said Fund. The above-said stock was given to satisfy pledges made to the Welfare Fund by the respective donors. There was an understanding between the donors and the Welfare Fund that Makoff, Inc., would redeem the donated shares within a short period of the date of donation of the shares. On August 2, 1960, the Welfare Fund sold 4,918 shares of Makoff, Inc., common nonvoting stock to Makoff, Inc., for $1.22 per share. On August 15, 1961, the Welfare Fund sold 3,278 shares of Makoff, *264 Inc., common nonvoting stock to Makoff, Inc., for a consideration of $1.22 per share. The following schedule reflects cash contributions made to the Foundation by Makoff, Inc., Samuel Makoff, Richard, and Samuel, Jr., during the years 1952 to 1962: Year
Makoff, Inc.
Samuel Makoff
Richard
Samuel, Jr.
1952
$ 3,500.00
$13,698.43
$2,975.26
$2,975.26
1953
1,800.00
6,511.25
3,006.25
3,006.25
1954
2,300.00
Unknown
Unknown
Unknown
1955
1,500.00
8,300.00
1956
8,565.62
7,351.72
7,471.28
1957
1958
1959
10,000.00
1960
1961
1962
During 1960 Makoff, Inc., declared a dividend of $.04 a share on all of its outstanding common stock, both voting and nonvoting, and paid $13,033.03 in dividends. During 1961 Makoff, Inc., declared a dividend of $.04 a share on all of its outstanding common stock and paid $12,901.92 in dividends. In both 1960 and 1961, the Foundation received from Makoff, Inc., dividends in the approximate amount of $10,193.33 on the 254,833.36 shares of Makoff, Inc., nonvoting common stock that had previously been transferred to the Foundation. In the Federal estate tax return of Samuel Makoff it was stated that *265 the fair market value of (1) the common voting stock of Makoff, Inc., and Realty owned by decedent was not in excess of $4,049.72 and $1,694.26, respectively, and (2) the common nonvoting stock of Makoff, Inc., and Realty owned by decedent was $157,998.98 and $72,812.67, respectively. In said estate tax return, charitable deductions in the amounts of $157,998.98 and $72,812.67 were taken for bequests to the Foundation of common nonvoting stock of Makoff, Inc., and Realty, respectively. In his notice of deficiency in Docket No. 1731-65, respondent determined, inter alia, (1) the fair market value of the common voting stock of Makoff, Inc., and Realty is understated on the estate tax return by the amount of $147,671.04; (2) the fair market value of the common nonvoting stock of Makoff, Inc., and Realty is overstated on the estate tax return in the total amount of $156,586.65; [7] and (3) the transfer of the foregoing shares of Makoff, Inc., and Realty stock to the Foundation does not qualify as a charitable gift or bequest under the provisions of section 2055, 1954 Internal Revenue Code. *266 In his notices of deficiency, respondent disallowed charitable deductions claimed by petitioners in their Federal income tax returns for contributions to the Foundation in the years and in the amounts as follows: Docket No.
Year
Amount
1228-64
1959
$ 9,631.25
1229-64
1959
9,185.00
1248-64
1959
8,826.25
1271-64
1959
8,826.25
1281-64
1959
8,826.25
3204-64
1959
8,826.25
3205-64
1959
8,826.25
3206-64
1959
8,826.25
3209-64
1959
8,826.25
3211-64
1960
9,740.48
3217-64
1960
9,900.30
110-65
1961
12,900.28
111-65
1961
12,600.16 The above-said deductions were disallowed on the grounds that petitioners failed to establish that the transfer of 7,061 shares of nonvoting common stock resulted in a completed gift. In the following dockets respondent also redetermined the fair market value of the nonvoting stock contributed to the Foundation as follows: Claimed in
Determined by
Docket No.
Return
Respondent
1228-64
$9,631.25
$49.31
1229-64
9,185.00
47.03
1248-64
8,826.25
45.19
1271-64
8,826.25
45.19
1281-64
8,826.25
45.19 In his notices of deficiency respondent disallowed charitable deductions claimed *267 by petitioners in the Federal income tax returns for contributions to the Welfare Fund in the years and in the amounts as follows: Docket No.
Year
Amount
3204-64
1960
$2,000.80
3205-64
1960
2,000.80
3206-64
1960
2,000.80
3208-64
1960
2,000.80
3209-64
1960
2,000.80
3210-64
1960
2,000.80
3211-64
1960
1,999.58
3212-64
1960
2,000.80
3217-64
1960
1,999.58
110-65
1961
1,999.58
111-65
1961
1,999.58
Ultimate Findings of Fact The fair market value of the outstanding stock of Makoff, Inc., was as follows: Year
Value
1959
$404,019.42
1960
384,986.39
1961
375,084.47
Opinion Sections 170 and 2055 of the Internal Revenue Code of 1954 provide deductions in computing the income tax and the estate tax, respectively, for amounts transferred to charity. The assets transferred to charity herein are shares of nonvoting stock of two closely-held family corporations, i.e., Makoff, Inc., and Realty. The recipient charities were (1) the Foundation, a tax-exempt corporation organized and operated by members of the Makoff family who held the stock in Makoff, Inc., and Realty, and (2) the Welfare Fund, *268 a tax-exempt charitable organization unrelated to the Makoffs. Respondent has stipulated that the gifts of nonvoting stock made to the Foundation were completed gifts for purposes of sections 170 and 2055. He has therefore abandoned the position which he took in his notices of deficiency that no completed gifts of stock were made. Respondent has not stipulated that the transfers of stock by the Makoffs to the Welfare Fund constituted completed gifts. Nevertheless, outside of his requested findings of fact, respondent has failed to press this contention on brief. The contributions of stock to the Welfare Fund by the Makoffs were no less completed gifts when made than were the contributions of stock to the Foundation. The fact that Makoff, Inc., redeemed the donated shares shortly after the gifts were made does not affect the reality of the original transfer of the shares by the Makoffs to the Welfare Fund. There is no evidence that the Welfare Fund (1) was required to have its Makoff, Inc., stock redeemed or (2) could not sell its Makoff, Inc., stock to third parties. Respondent argues on brief that the value of the stock transferred to the Foundation and to the Welfare Fund is *269 unascertainable and charitable deductions are therefore not allowable. Accordingly, we must determine whether the value of the nonvoting stock in issue is unascertainable so that the charitable deduction therefor is not allowable. Respondent grounds his position primarily on the argument that the factor of overlapping control - that is, control by the Makoffs of Makoff, Inc., Realty, and the Foundation - is in and of itself sufficient to make the value unascertainable and to require the disallowance of the charitable deduction. [8] This contention constitutes, in substance, merely a rephrasing of the issue which respondent has allegedly conceded, to wit, no completed gift to charity was made. [9] Respondent cites as authority section 1.170-1(e), Income Tax Regs., and section 20.2055-2(b), Estate Tax Regs. Those regulations concern transfers which are made subject to a condition or to a power remaining in the transferor. As aforementioned, respondent has conceded that the transfers to the Foundation were completed gifts of securities. Moreover, there were no conditions or powers to which the transferred stock was subject. Thus, respondent's reliance on the *270 above-cited regulations is incorrect. The cases proffered by respondent in support of his position are readily distinguishable on their facts from the instant case. [10] In Elise McK. Morgan, 42 T.C. 1080 (1964), affd. per curiam 353 F. 2d 209 (C.A. 4, 1965), certiorari denied 384 U.S. 918 (1966), nonvoting stock of a closely-held corporation was given to a trust. The trust indenture provided that the trust was to pay its entire net income to a charitable foundation for 20 years and, thereafter, the remainder of the corpus was to go to the taxpayer's children. This Court held that the value of the charity's income interest was unascertainable because: the trust instrument contained no provisions guaranteeing income to the charity. The donors can at any time deny any benefits to the charity by refraining from declaring dividends. * * * It went on to state: *271 the gift tax provisions * * *, as in the case of estate tax, offer no deductions for gifts or bequests which might never reach charity. See Commissioner v. Sternberger's Estate, 348 U.S. 187 (1955). Merchant's Bank v. Commissioner, 320 U.S. 256 (1943), involved a residuary bequest in trust which provided an interest in decedent's wife for her life with remainder to charity. The trustee was given power to invade the corpus of the trust at his discretion and was expressly directed for this purpose to consider the wife's happiness and interest prior to the interest of the remainder charity. The Supreme Court held that the liberal range of discretion possessed by the trustee brought "into the calculation (of the value of the charity's remainder interest) elements of speculation too large to be overcome." Merchant's Bank v. Commissioner, supra at 263. In Commissioner v. Sternberger's Estate, 348 U.S. 187 (1955), a testator made a remainder gift of the principal of his residuary estate to a charity upon the death of his surviving daughter, provided that his daughter died without descendants surviving her. At the time of his death, *272 the testator's daughter was 27. The Supreme Court, in denying the charitable deduction, stated that the Internal Revenue Code offers "no deductions for bequests that might never reach charity." 348 U.S. at 194. The rule established in the foregoing cases may be summarized as follows: Charitable deductions will be disallowed on the ground of unascertainable value where there are no legal assurances as to what, if anything, will be received by the charity. Here, the donated stock was not subject to any legal conditions, powers, or restrictions which made it doubtful that the Foundation would ever receive or keep the donated property. Here, there is no question that the transfers of stock to the Foundation constituted outright gifts, effective upon receipt. For the *273 reasons stated above, we conclude that the factor of overlapping control does not cause the value of the nonvoting stock transferred to the Foundation to become unascertainable. Respondent further argues that the alleged existence of corporate siphoning, the alleged probability of future siphoning, and the alleged misuse of the Foundation require the conclusion that charity received nothing which can be valued upon the receipt of the nonvoting stock. Respondent alludes to various activities and transactions involving the Makoffs and their related business entities which he claims support his charge of corporate siphoning of income. The first instance of alleged corporate siphoning arises from the rental by Realty to Richard and Samuel, Jr., of two personal residences. After periodic improvements were made, the cost of the Maywood house, less land, during the years in issue was $58,571.76 and the cost of the Kaywood house was $65,462.15. During the years in issue the average rent for the Maywood house was approximately $166 per month and the average rent for the Kaywood house was approximately $200 per month - an average gross return of approximately 3.5 percent. We note, however, *274 that (1) during its fiscal year ended April 30, 1960, Realty did not pay a salary to Richard or Samuel, Jr., who served as its president and vice-president, respectively paid to both Richard and Samuel, Jr., as salary, $1,000. In the fiscal year 1961, Realty had total income of $84,287.07 and taxable income of $12,983.40. Although the rental paid by Richard and Samuel, Jr., to Realty for their residences appears to be low, we believe that the lack of any salaries paid to them by Realty nullifies respondent's accusation of corporate income siphoning resulting from this arrangement. However, even if this arrangement did represent an instance of so-called corporate siphoning, it would hardly be sufficient to render worthless the value of Realty's nonvoting stock. Respondent points to the salaries received by the Makoffs as sustaining his charge of corporate siphoning. However, we have no reason to believe that the salaries paid by Makoff, Inc., to the Makoffs during the years in issue were unreasonable or even particularly large. In fact, the evidence indicates that they were not unreasonable. [11] The fact that both Richard and Samuel, Jr., drew $1,000 in salary from Realty after their *275 father's death, although theretofore no salary had ever been paid by Realty, signifies nothing despite respondent's assertions to the contrary. Respondent concedes (1) that the pension and profit-sharing plan was designed to benefit the employees of Makoff, Inc., and (2) that Amendment No. 1 was probably not intended to be permanent. However, respondent contends that the Makoffs received substantial economic benefit from the plan. This, respondent claims, is another aspect of corporate siphoning by the Makoffs. We agree with respondent to the extent of his claim that Richard and Samuel, Jr., received economic benefit from the plan; however, we do not believe that it represented a means of corporate siphoning. Amendment No. 1 was adopted by Makoff, Inc., for valid business reasons - that is, primarily to benefit key executive personnel during a period of management transition as a means of insuring their continued employment with Makoff, *276 Inc. The amendment was a temporary measure and, indeed, it was repealed partially in 1961 and finally in 1965. The fact that the Makoffs, as employees, benefited along with other personnel does not support respondent's charge. Respondent focuses on the transaction in which R & S Company purchased from Securities Corporation a reversionary interest in Lots 4 and 5 as an instance of corporate siphoning. Respondent suggests that the price paid by R & S Company to Securities Corporation for "two large lots in a choice area of Salt Lake and a $750,000.00 improvement" was too low. Furthermore, he suggests that the $197,500 received by Realty for the Whitehall Building and the parking lot was also too low, thereby implying that R & S Company benefited in the transaction to Realty's detriment. However, respondent disregards the fact that R & S Company was merely buying Securities Corporation's reversionary interest in Lots 4 and 5 rather than a present fee interest. The Makoffs obtained an appraisal of the properties involved and used such appraisal for structuring the transaction. We conclude that the transaction was fair and in no way serves respondent by showing corporate siphoning on *277 the part of the Makoffs. Respondent claims that the Makoffs were culpable of corporate siphoning resulting from the various assignments of the leases of realty on which the Makoff, Inc., store and parking lot are located. The facts of these several transactions have been set forth with considerable specificity and we see no need of reiteration. Considering the amounts which Realty and R & S Company expended in improving Lots 4 and 5, we do not believe that the increased rental agreed to by Makoff, Inc., was unjustified. Furthermore, the price which R & S Company agreed to pay Realty appears to have been fair and reasonable. We have considered all of respondent's arguments on this question, even those raised for the first time on brief; however, we are not convinced that the Makoffs were guilty of any overreaching on this matter. Commencing in 1959 Richard and Samuel, Jr., each rented a Jaguar automobile from Makoff, Inc., which, in turn, rented the cars from Realty. Richard and Samuel, Jr., each paid Makoff, Inc., $50 a month for use of the cars. Makoff, Inc., paid Realty $100 per month for each car. Both cars were used in the course of business and the rental which Richard and *278 Samuel, Jr., paid was intended to reflect their personal use of the cars. However, they have failed to show that the rental they paid to Makoff, Inc., was fair and reasonable. In the absence of any other facts, this arrangement may possibly be said to constitute an instance of so-called corporate siphoning but it is hardly one which would cause the value of the nonvoting stock of Makoff, Inc., and Realty to become unascertainable. We do not believe that there exists a reasonable probability of corporate siphoning by the Makoffs of funds from Makoff, Inc., and Realty which would cause the value of the stock in issue to become unascertainable. Moreover, we can see nothing in the Makoffs' operation of, and dealings with, the Foundation which would cause the value of the nonvoting stock of Realty and Makoff, Inc., to become unascertainable. (We note that respondent's allegations in this latter regard are not particularly relevant to the problem which concerns us here.) Although we have carefully scrutinized the record before us and given due consideration to all of respondent's arguments, we are unable to conclude that the value of the nonvoting stock of Makoff, Inc., and Realty was *279 unascertainable during the years in issue. Having thus decided that the value of the nonvoting stock during the years in issue can be ascertained, we must determine whether petitioners have proven the value of the stock which they contributed to the Foundation and to the Welfare Fund. We have made ultimate findings of fact as to the fair market value of the outstanding capital stock of Makoff, Inc., during the years in issue, [12] and the total valuation of Realty has been stipulated. However, we are not primarily concerned with the total valuation of the business but rather with the value which should be allocated to the nonvoting stock. Petitioners' expert witness, James S. Park, has testified that 97 percent of the total value of each corporation should be allocated to the nonvoting stock. To reach his allocation, Park compared various *280 securities listed on established exchanges and securities traded over the counter with the stock in issue. However, Makoff, Inc., and Realty stock are neither listed securities nor traded over the counter. We are not convinced that sales of stock in listed corporations and sales of stock in corporations traded over the counter are wholly comparable to the sales of stock in nonlisted corporations and stock not traded over the counter. Park has not given us any reason to believe otherwise. Therefore, we do not accept Park's testimony as dispositive of the allocation problem. Instead, we have used Park's expert testimony merely as one of several relevant factors to be considered in reaching a proper allocation. After considering all other relevant factors, including the growth and earnings history of the two corporations, the dividends paid on the nonvoting stock in issue, and the pension plan, we believe that the value of the nonvoting stock of both Makoff, Inc., and Realty during the years in issue was equal to not more than 60 percent of the value of the total outstanding capital stock of each corporation, and we so hold. Our decision determines (1) the proper amount to be allocated *281 to the nonvoting common stock of Makoff, Inc., and Realty for purposes of ascertaining the value of the charitable deductions in issue and (2) the proper values to be attributed to both nonvoting common stock of Makoff, Inc., and Realty for purposes of ascertaining the gross estate of Samuel Makoff. Decision will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Samuel E. Makoff, Jr., and Verna A. Makoff, Docket No. 1229-64; Samuel Makoff, Deceased, Richard P. Makoff, Special Administrator, and Richard P. Makoff, Docket No. 1248-64; Syril Makoff, Docket No. 1271-64; Samuel Makoff, Deceased, Richard P. Makoff, Special Administrator, and Syril Makoff, Docket No. 1281-64; Samuel Makoff Trust #101, Transferee, Richard P. Makoff and Samuel E. Makoff, Jr., Trustees, Docket No. 3204-64; Samuel Makoff Trust #601, Transferee, Richard P. Makoff and Samuel E. Makoff, Jr., Trustees, Docket No. 3205-64., Syril Makoff Trust #501, Transferee, Richard P. Makoff and Samuel E. Makoff, Jr., Trustees, Docket No. 3206-64; Syril Makoff, Docket No. 3208-64; Samuel Makoff Foundation, Inc., Transferee, Docket No. 3209-64; Samuel Makoff, Deceased, Richard P. Makoff, Special Administrator, and Syril Makoff, Docket No. 3210-64; Samuel E. Makoff and Verna A. Makoff, Docket No. 3211-64; Samuel Makoff, Deceased, Richard P. Makoff, Special Administrator, and Richard P. Makoff, Docket No. 3212-64; Richard P. Makoff and Colleen M. Makoff, Docket No. 3217-64; Samuel E. Makoff, Jr., and Verna A. Makoff, Docket No. 110-65; Richard P. Makoff and Colleen M. Makoff, Docket No. 111-65; and Samuel E. Makoff, Deceased, and Richard P. Makoff, Special Administrator, Docket No. 1731-65.↩
2. One issue conceded by respondent, raised by his notice of deficiency in every docket herein, was that no completed gifts to charity were made.↩
1. stock dividends↩
3. The Plan replaced a profit-sharing plan adopted previously by Makoff, Inc., which was strictly a profit-sharing arrangement with absolute vesting after 10 years of employment.↩
4. Makoff, Inc., had hired a considerable number of new executive personnel upon the opening of a new store a few years prior to 1957. ↩
5. Samuel Makoff was aging and it was realized that, in the event of his retirement or death, continuity of management personnel was necessary.↩
6. Makoff, Inc., did not make any improvements on Lot 5.↩
7. Respondent reduced the gross estate by reducing the value of 129,507.36 shares of common nonvoting stock of Makoff, Inc., from the $157,998.98 shown on said return to $34,515 and by reducing the value of the 74,679.66 shares of common nonvoting stock of Realty from the $72,812.67 shown on said return to $39,710.↩
8. Presumably, this argument applies exclusively to the contributions of stock to the Foundation since the Welfare Fund was not controlled by the Makoffs. ↩
9. See footnote on page 3 hereof.↩
10. Elise McK. Morgan, 42 T.C. 1080 (1964), affd. per curiam 353 F. 2d 209 (C.A. 4, 1965), certiorari denied 384 U.S. 918 (1966); Merchants Bank v. Commissioner, 320 U.S. 256 (1943); Commissioner v. Sternberger's Estate, 348 U.S. 187↩ (1955).
11. The salaries paid to the Makoffs showed a declining percentage in relationship to Makoff, Inc.'s net sales, going from 5.75 percent for the fiscal year ending January 31, 1959, to 3.79 percent for the fiscal year ending January 31, 1962.↩
12. Based upon an examination of all relevant factors, including inter alia the redemption price of Wood's and Spitzer's stock in 1957 and James S. Park's testimony, we believe that the fair market value of the total outstanding capital stock of Makoff, Inc., was as follows: ↩
1959
$404,019.42
1960
384,986.39
1961
375,084.47